IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RED PONTIAC GTP, NORTH DAKOTA LICENSE PLATE NUMBER 24377, VIN NUMBER 2G2WR524151131984, CURRENTLY LOCATED AT 303 SMITH DRIVE SW, DEVIL'S LAKE, ND 58301 AND THE BLACK APPLE iPHONE WITH THE BLACK INCIPIO CASE LOCATED AT 102 N 4TH STREET, SUITE 304, GRAND FORKS, ND 58203. | Case No. 3:22-mj-558 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Joel A. Lowry, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent ("SA") with the Federal Bureau of investigation ("FBI") and have been since October 2021. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to the Minneapolis Division, Grand Forks, North Dakota Resident Agency, of the FBI. I am tasked with investigating criminal offenses including the investigation of financial crime, threats to national security, violent crime and assault within Indian country, crimes against children, and certain activities relating to material involving the sexual exploitation of minors. I have conducted or participated in physical surveillance, interviewing subjects, witnesses, and victims, and the execution of search warrants and arrests.

My duties include the investigation of violent crimes occurring within Indian country, specifically on the Spirit Lake Reservation, including assault, manslaughter, and murder.

2.  This affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the location specifically described in **Attachment A** of this Affidavit, specifically the vehicle of SHAWDAY MCKAY ("SHAWDAY") for evidence related to violations of 18 U.S.C. 1111 (Murder); 18 U.S.C. 1112 (Voluntary Manslaughter); 18 U.S.C. § 113(1), (3), and (6) (Assault with Intent to Commit Murder, Assault with a Dangerous Weapon, Assault Resulting in Serious Bodily Injury), and 18 U.S.C. § 1153(a), (Offenses in Indian Country); which items are more specifically described in **Attachment B** of this Affidavit. SHAWDAY'S vehicle is a red Pontiac GTP bearing North Dakota license plate number 24377 and VIN number 2G2WR524151131984 ("**Vehicle**").

3.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the **Subject Offenses** occurred in the **Vehicle** and evidence related to the **Subject Offenses** is located within the **Vehicle**.

4.  The statements contained in this affidavit are based, in part, on: my personal observation, information provided by other agencies, reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; independent investigation, and my experience, training and background as a Special Agent with the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## PROBABLE CAUSE

5.  On September 29, 2022, Bureau of Indian Affairs ("BIA") Special Agent ("SA") Jerry Lenoir called to inform me of an assault by stabbing that occurred in the **Vehicle** while it

was located outside or near the residence of MAXINE BUCKLES ("MAXINE"), Unit 240, Fort Totten, North Dakota.

6. I was informed by SA Lenoir that the **Vehicle** was located in Devils Lake, North Dakota, and that two deceased individuals were inside.

7. I was informed by SA Lenoir that Starson Buckles ("BUCKLES") and Lance Ross ("ROSS") were identified as the two deceased individuals inside the **Vehicle**. Xavier Buckles ("XAVIER") was being treated at CHI St. Alexius in Devils Lake, North Dakota. XAVIER was described as "unresponsive."

8. I arrived at the scene of 220 Kemp Avenue SE, Devils Lake, ND, where **Vehicle** was located. I was told by SA Lenoir this was the residence of ROSS. I looked in the car and saw what appeared to be two deceased males. I was informed by SA Lenoir and by SHAWDAY that these individuals were ROSS and BUCKLES. I saw what appeared to be open wounds on the two bodies and a large amount of red substance all over the inside of the **Vehicle**.

9. I interviewed SHAWDAY, who said she was the owner of the **Vehicle**, and provided the following information:

    a. SHAWDAY was in a relationship with BUCKLES.

    b. Earlier that night she was drinking with DANIEL AZURE ("AZURE"), XAVIER[1], ROSS, and BUCKLES. SHAWDAY was riding in the back seat of the

---

[1] On September 30, 2022, I interviewed XAVIER about the **Subject Offenses**. XAVIER denied he was in the **Vehicle** and denied riding to MAXINE's residence with SHAWDAY. XAVIER said he walked up to the property after the altercation had already started.

    **Vehicle** between ROSS and BUCKLES while driving to MAXINE's residence. AZURE was driving the **Vehicle**, and XAVIER was in the front passenger seat.

c. BUCKLES and SHAWDAY got in an argument. ROSS defended SHAWDAY which led to ROSS and BUCKLES getting into an argument.

d. At the MAXINE's residence, but still in the **Vehicle**, BUCKLES and ROSS' argument escalated into a physical altercation.

e. SHAWDAY believed ROSS pulled out a knife because she knew he had just purchased a knife from Amazon.

f. SHAWDAY saw approximately six or seven people, who she described as "Buckles family members" circle around the **Vehicle**. SHAWDAY tried to stop them but was dragged from the **Vehicle** by her feet by AZURE.

g. SHAWDAY did not see exactly what happened next and asserted she "blanked out" part of her memory.

h. SHAWDAY rode to Ross' sister's home and picked her up in the **Vehicle**.

i. Ross' sister is SIERRAH ROSS ("SIERRAH").

j. SHAWDAY did not clearly remember how they got to SIERRAH's house, who drove to the house, or who else was in the car.

k. SHAWDAY asserted she started to regain her memory when they arrived at SIERRAH's house.

l. SHAWDAY, ROSS, BUCKLES, and SIERRAH were in the **Vehicle** and SHAWDAY drove from Fort Totten to Devils Lake to Kemp Avenue on the street outside ROSS' residence. On the way, ROSS' and SIERRAH's mother, ASHLEY

ROSS ("ASHLEY"), called ROSS' phone. SIERRAH answered the phone and told ASHLEY what happened.

m. SHAWDAY believed ASHLEY called Law Enforcement.

n. After the call with ASHLEY, SHAWDAY unlocked ROSS' phone and sent a text message to her sister, KIEMARAH REDFOX (REDFOX). REDFOX was sleeping at ROSS' apartment.

o. Law Enforcement arrived five to ten minutes after SHAWDAY arrived at Kemp Avenue.

p. Medical personnel arrived after Law Enforcement.

10. I asked SHAWDAY about a phone located on or in the car and she told me her phone was located inside ROSS' residence. She told me the phone I referenced was ROSS' phone and is the one that SHAWDAY and SIERRAH used while in the **Vehicle**.

11. The referenced phone is a black Apple iPhone with the black Incipio case ("**Target Phone**")

12. SHAWDAY provided me the password to the **Target Phone** and said it was the password used to unlock the phone so she could text REDFOX while in the **Vehicle**.

13. When I arrived at Kemp Avenue in Devils Lake, I witnessed two bodies identified as BUCKLESS and ROSS in the back of the **Vehicle**. BUCKLES and ROSS appeared to be deceased. One of the bodies had an open chest wound. Based upon my training and experience, the chest wound appeared to be caused by a sharp object. I observed and learned from other agents that there was a large, empty knife sheath located on the waistband of the jeans of ROSS.

14. There were no knives located on Kemp Street around the vehicle.

15. Later in the day on September 29, 2022, officers from multiple law enforcement agencies searched the area around MAXINE's residence. Though two knives were located in the vicinity, neither had visible signs of blood evidence.

16. Following removal of the bodies, the **Vehicle** was removed from Kemp Street and is secured at the Lake Region Narcotics Task Force, 303 Smith Drive SW, Devils Lake, ND 58301. Upon arrival, the **Vehicle** doors were secured with evidence tape to prevent tampering and to ensure the **Vehicle** would remain in a static condition

17. Following removal of the bodies, the **Target Phone** was seized and is secured at the FBI Grand Forks Resident Agency, 102 N 4th Street, Suite 304, Grand Forks, ND 58203.

18. I am aware that enrollment records have previously been obtained for ROSS and XAVIER in prior FBI investigations and they are enrolled members with the Spirit Lake Sioux Tribe.

19. I am aware from work done by prior FBI agents that Spirit Lake Tribal enrollment certificate for MAXINE identifies her residence as 214 4th Avenue, Fort Totten, North Dakota. This unit number on this document is different than the Unit number commonly used by BIA law enforcement in their records and responses – which is Unit 240. Your affiant and other agents with the FBI have been to the residence of MAXINE numerous times and also refers to it as Unit 240, located at latitude 47.979641, longitude -98.999017 according to the Spirit Lake Realty land status records

20. I am also aware that on April 29, 2021, Spirit Lake Realty specialist Austin Desjarlias provided land status for the MAXINE'S residence. MAXINE's residence is located within the exterior boundaries of the Spirit Lake Indian Reservation.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable

  storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When

a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

    addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22.  Based on my training, experience, and research, I know that **Target Phone** has capabilities that allow it to serve as a wireless telephone, connection to the internet and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

24.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

25. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

26. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

27. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

28. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

29. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

31.  *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

32.  The warrant I am applying for would permit law enforcement to use FBI tools to open, access, and examine contents of the electronic devices without knowing the device's password and without access to physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) which could be used to unlock the devices.

## CONCLUSION

33.  Your affiant respectfully submits that there is probable cause to believe that the Subject Offenses have been committed by yet unknown individuals inside and outside the **Vehicle** and evidence of the Subject Offenses is located on the inside the Vehicle, on the **Vehicle** and within the **Target Phone**. Based upon the information above, your affiant requests a search warrant for the items described in Attachment A for items described in Attachment B. The foregoing is true to the best of my knowledge and belief.

## REQUEST FOR SEALING

34.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for one year – until September 30, 2023. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Joel Lowry
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on September 30, 2022: via telephone.

UNITED STATES MAGISTRATE JUDGE